## ST. LOUIS COKE & IRON CO. et al. v. GOLTRA. *

No. 4203.

Circuit Court of Appeals, Seventh Circuit.
May 28, 1930.

Rehearing Denied July 3, 1930.

*Rehearing denied July 3, 1930.

Peter B. Nelson, of Chicago, Ill., for appellant.

Joseph T. Davis, of Tuscola, Ill., for appellee.

Before ALSCHULER, PAGE and SPARKS, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above).

It is urged that the contract was speculative, and that the chance or risk of its ultimate performance was assumed wholly by Goltra. That Goltra assumed the risk of a sufficient supply of cars for delivery of the coal is apparent. But he did not assume risk of his failure to receive coal for transportation by his barges because of inequitable conduct of the chemical company. The large expense which Goltra necessarily incurred on the faith of the contract, in assembling and manning the barges and transporting them to Caseyville for loading, required the utmost good faith toward him on the part of the chemical company, so that he would not

be capriciously or purposely hindered or defeated in securing the coal for transport. The very much higher charge for carriage by barge furnished a strong motive for holding back on deliveries to the barges, in the hope that ultimately sufficient cars might be available. The tremendous increase in the price at the mines of this coal—more than double in a very few months—furnished another motive for delaying performance, in the hope that the happening of impending events would bring lower prices.

The parties entered into the contract in view of well-understood existing conditions. There were labor troubles in the mining field, whereby important prior sources of coal supply had been cut off, and the chemical company, with its business in Illinois, somewhat inland from East St. Louis, was mainly, if not entirely, dependent for its large daily coal requirements on the West Kentucky Coal Company, a Kentucky concern with coal mines in Kentucky about 25 miles from Caseyville, which is on the Ohio river. There was also a strike of railroad switchmen which seriously threatened the supply of cars. The chemical company's normal requirements were about 1,200 tons per day, and its minimum requirements in this period about 700 tons. Had it not been seriously anticipated by all concerned that there would be a deficiency in the supply of cars, such a contract would not have been made. In this situation the chemical company agreed to furnish Goltra, for transportation by his barges, the definite quantity of 10,000 tons, subject only to the contingency of sufficient car supply.

But it is contended that during all the time in question the chemical company did receive in the neighborhood of 500 tons per day by cars, and that therefore there was no occasion to use Goltra's barges, and hence no liability under the contract. This involves questions of fact as to which there is considerable confusion, if not direct contradiction. Appellants point to a letter from the Kentucky Company, also dated July 22, wherein the Kentucky Company practically abrogates all its previous agreements with the chemical company respecting coal supply, and proposes that, subject to conditions beyond control, they ship the chemical company daily approximately 500 tons of 2½-inch lump coal, and in addition such screenings as they can spare during the period of the engagement. Nothing was said as to time, and as to price it was stated, "prices are to be based upon our advice from time to time as the market justifies." This does not indicate that chemical company expected to receive only 500 tons per day. The letter is indefinite in that it includes also screenings, which might alone amount to several hundred tons per day.

We do not definitely know from the evidence whether such coal as was supplied met all the chemical company's reasonable requirements; but it is more than likely from the evidence that the chemical company could well have used substantially more coal than it received by rail, and could have received it from the Kentucky Company had it authorized the latter to place it on Goltra's barges. It is very significant that during the time in question, while Goltra was demanding that his barges be loaded so that he might fulfill his contract, there was no intimation on the part of the chemical company that its needs were being amply supplied by cars, and that there was thus no occasion to load Goltra's barges. On the contrary, it was represented by the chemical company that, owing to lack of understanding with the Kentucky Company, coal was not forthcoming for loading the barges, and that this, and not the sufficient supply of cars, was the reason why the barges were not loaded.

It is pointed out that the railroad strike ended August 22, and that thereafter there was no need for the barges, and that the contract therefore ended on that date. While it does not appear how soon after the ending of the strike the car supply became normal, it cannot be said that Goltra was in any way affected by the Kentucky Company's letter respecting the 500 tons per day. It does not appear that Goltra ever saw this letter. His contract was for the transportation of 10,000 tons, not 500 tons per day. He had the capacity for bringing the whole contracted tonnage at one time if he could have loaded his barges.

It is contended that Goltra himself breached the contract by failing to have his boats at the Caseyville tipple within ten days after the contract was made. It seems there was some delay in getting the crews and starting, but that they left St. Louis on August 7 with some barges, picking up more on the way, and on reaching Paducah, Ky., on August 9, he was there informed by representatives of the Kentucky Company that the government was dredging under the Caseyville tipple and it would be three or four days before the barges could be got in to take coal. They proceeded leisurely up the

river and got there before the dredging was completed, the first barge reaching Caseyville on the 13th. By the 15th there were six or seven barges there, each of 2,500 tons capacity. On calling the Kentucky Company's office he was informed that they had no orders to load coal on the barges, and, on communicating with Mr. Johnson of the chemical company, he told Johnson that the Kentucky Company people had said cars were short, and they would like to load the barges, but had no orders from the chemical company to do so. Johnson said he was having some difficulty or contention about the coal, but that it would be straightened up at once, and that they would load the barges right away. The barges remained there the remainder of August, waiting to be loaded. In all this time there was no suggestion that Goltra was in default in not getting the barges there within the ten days. But, in any event, if it was considered that he thus breached the contract, Johnson should not have kept him there on the promise that matters with the Kentucky Company would be straightened out, and that the barges would be loaded. If there was a breach by Goltra, it was clearly waived by the chemical company, who with knowledge of the facts encouraged Goltra to remain at the Caseyville tipple to have his barges loaded in pursuance of the contract.

Considerable of what is above stated has direct bearing also on Goltra's contention and the master's finding that the chemical company breached the contract, a proposition which we further consider.

■ In evident response to the letters of the 22d the chemical company wired:

"St. Louis July 24 1922.

"West Kentucky Coal Company Paducah, Ky.

"We accept terms and conditions in letter from your President of twenty-second instant and authorize you to immediately start loading barges for our account and transport the coal from mines at the transportation rate specified FOB barge along side Fox Terminal East St. Louis Ill. These shipments to apply on our Purchase Memo number two fifteen calling for Caney Fork Lump but for barge loading you may also apply number nine lump. We will sign barge liability agreement mailing same today. Please execute a copy and return to us for our files. It is understood that there is to be no demurrage on barges at either the loading or unloading point this matter agreed to by

your President over long distance but not covered in his letter.

"St. Louis Coke & Chemical Company
"per F. R. Johnson"

This clearly indicated at that time a condition which then reflected a lack of sufficient car supply, with no evidence of any change in that regard until after the strike had ended. Indeed, shortly before Goltra's barges reached Caseyville, there had been shipped upwards of 5,500 tons on barges of the Kentucky Company, notwithstanding the far larger carrying charges by such route. There must then have been car shortage, and there is no evidence of change in this regard for two weeks thereafter.

Besides, when the chemical company contracted with Goltra for the transportation, subject to the named contingency, of 10,000 tons of coal, he had the right to assume that the chemical company had some definite arrangement for obtaining the coal to be transported. But this appears to have been far from the fact. The Kentucky Company's letter of July 22, abrogating all previous arrangements, was merely a proposition that so long as it saw fit to do so it would let the chemical company have approximately 500 tons of coal per day, at practically such price as the seller might fix under the prevailing markets. It bound the seller to nothing, and it is readily conceivable that disagreements promptly arose, and because of which the coal for transportation by the barges was not forthcoming notwithstanding the engagement with Goltra for 10,000 tons.

To induce Goltra by this contract to incur the expense of taking these barges this long distance to the Caseyville tipple, and to keep them there for several weeks in the expectation that he would receive for transport the 10,000 tons of coal for which the chemical company had no binding contract, nor lawful right to demand, is scarcely compatible with equity and good conscience, and we see no reason for disturbing the conclusion of the master and the court that the contract, made in view of the existing conditions, was breached by appellant in failing to supply the coal for transportation. There were sharp contradictions in the evidence respecting many of the facts, and as to such we accept the conclusion of the master who saw and heard the witnesses.

■ As to the amount awarded we cannot perceive wherein the court erred. If the chemical company had breached the contract before Goltra undertook to perform, there

would have to be deducted from the amount he was to receive his expense of executing the contract. But here, on the faith of the contract to transport the 10,000 tons, Goltra incurred the expense of manning the barges, taking them to the place contracted for, keeping them ready there with the consent and encouragement of the chemical company until about September 1, and then returning them from whence he took them. The contract price was credited with $5,089.02 which he received for transporting other coal to St. Louis on the return trip of the barges.

No reason is apparent to us why the order of the District Court should be disturbed, and it is accordingly affirmed.